**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KENNETH MARCO HARDIE,<br>*Plaintiff*,<br>v.<br>GOOGLE, LLC,<br>*Defendant.* | No. 25-cv-03933 (DLF) |

**MEMORANDUM OPINION AND ORDER**

Kenneth Marco Hardie brings this action against his former employer, Google, LLC, alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the D.C. Human Rights Act, D.C. Code § 2-1402. Before the Court is Google's Partial Motion to Dismiss, Dkt. 7. For the reasons that follow, the Court will grant the motion.

## I. BACKGROUND

Hardie is an "experienced Black sales and marketing professional with over 20 years of experience," Compl. ¶ 11, Dkt. 1, who joined Google in August of 2017 as Head of Industry for the company's Government & Advocacy division in Washington, D.C., *id.* ¶¶ 1, 12–13. At Google, an employee's level determines his "compensation, promotion track, and managerial authority." *Id.* ¶ 13. Although Hardie's qualifications and experience "aligned" with a Level 7, Google hired him as a Level 6. *Id.* ¶ 14; *see id.* ¶¶ 14–15.

Hardie was "extremely successful" in his role, generating year-over-year growth and earning "Exceeds Expectations" performance reviews in both 2018 and 2019. *Id.* ¶¶ 19–20. But despite his success, Google delayed promoting him. *Id.* ¶¶ 23–24. Hardie informed his direct

supervisor, Courtney Kuhl Rose—"a White woman and the Director of Government & Advocacy," *id.* ¶ 23—that he intended to seek a promotion to Level 7, but Rose told Hardie that he "needed to get something big over the finish line" in order to secure a promotion, *id.* ¶ 24. Rose did not impose similar requirements on her non-Black direct reports, *id.* ¶ 25, and Google's written promotion policy did not contain any such requirement, *id.* ¶ 26. Furthermore, while Rose declined to promote Hardie, she "promoted a White woman, Ali-Jae Henke," to Level 7 in 2019. *Id.* ¶ 28. Henke "was objectively less qualified and experienced" than Hardie, and she had just been promoted from Level 5 to Level 6 the previous year. *See id.* ¶¶ 29–30.

Hardie nevertheless continued to lead his team successfully, earning a "Strongly Exceeds Expectations" review in 2020. *Id.* ¶ 33; *see id.* ¶¶ 32–33. Google ultimately promoted him to Level 7 in 2020, "two years after he should have been at [that] level and over one year after promoting his non-Black counterpart, [Henke]." *Id.* ¶ 33.

Hardie's delayed level increase "not only denied him compensation and career prestige, . . . it also directly impacted his ability to apply for and receive future promotions." *Id.* ¶ 34. When Rose left her role as Government & Advocacy Director in 2021, she told Hardie that there was a "strong possibility" that he would not be eligible to replace her because he had not been a Level 7 for at least 18 months. *Id.* ¶ 36; *see id.* ¶¶ 35–36. Hardie viewed the requirement as "new and arbitrary" and told Rose that it "was discriminatory because it kept the most qualified Black candidates from being considered." *Id.* ¶ 37. Although Hardie was one of the two final candidates for the role, Google selected Henke to replace Rose. *Id.* ¶ 44. Henke began her role as the Director of Government & Advocacy in March 2022. *Id.* ¶ 47.

When Henke announced that she was taking maternity leave from October 2022 to May 2023, Hardie was selected to serve as Interim Director during her leave. *Id.* ¶¶ 50–51. He was "extremely successful" in the role, *id.* ¶ 53, receiving "glowing feedback" for his work, *id.* ¶ 55.

When Henke returned from maternity leave in May 2023, *id.* ¶ 58, Hardie told her that the "addressable opportunity in his book of business would be significantly declining during the remainder of the year, impacting his ability to drive revenue and meet his targets," *id.* ¶ 59. Although Hardie's "White counterpart," Sean Harrison, had additional revenue streams that could be reallocated to Hardie, Henke "refused to re-organize the workloads," *id.* ¶ 60, or allow Hardie to "work on opportunities that were no longer priorities" for Harrison, *id.* ¶ 61. "[D]espite refusing to equitably re-organize the team's book of business," however, Henke "continued to assign . . . Hardie disproportionately higher growth quotas." *Id.* ¶ 63. Later in 2023, she issued Hardie a "Significant Impact" rating, which was "substantially lower" than the ratings he had received in prior years. *Id.* ¶ 64.

Throughout 2023 and 2024, Henke also repeatedly declined Hardie's requests for increased programmatic and administrative support staff, *id.* ¶¶ 65–68, even though Google provided his non-Black counterparts with "fully staffed and more experienced support teams," *id.* ¶ 69. Henke also "publicly reprimanded" Hardie for certain projected business losses, *id.* ¶ 73, while ignoring comparatively larger losses attributable to his "White counterpart," Julia Rothwell, *id.* ¶ 74.

In 2023, Hardie applied for three Level 8 director roles. *Id.* ¶ 70. Although he was the first runner-up candidate for each position, non-Black candidates were chosen over him. *Id.* ¶ 71.

On November 10, 2024, Hardie met with Jacky Schiestel, "a White woman and Human Resources Business Partner," to report Henke's "biased and unfair account assignments and denial of resources." *Id.* ¶ 76. Schiestel, in turn, directed Hardie to speak with Cayla Tankersly, "a White

woman and People Consultant." *Id.* ¶ 77. Hardie met with Tankersly on November 18, 2024, and shared with her Henke's "targeted and adverse treatment [of him] compared to his non-Black peers." *Id.* After Henke met with Schiestel and Tankersly, Henke's "adverse treatment only intensified." *Id.* ¶ 78; *see id.* ¶¶ 78–80. When Hardie voiced his concerns regarding Henke to a manager who had previously praised his work, *see id.* ¶¶ 45, 83, the manager "shut down" the conversation, *id.* ¶ 81, and suggested that Hardie was "the problem" and "should transfer to another department," *id.* ¶ 84.

On March 3, 2025, Hardie was terminated from Google in a video meeting with Henke and Tankersly. *Id.* ¶ 87. During the meeting, Henke "read from a script and communicated that Google was terminating [his] employment because he had 'performance challenges' that had not improved." *Id.* A few weeks prior, Henke had given Hardie a "Significant Impact" performance review—a reduced rating from those he had received previously. *Id.* ¶ 86; *see id.* ¶¶ 85, 89. But she did not then and had not previously "articulated any 'performance challenges' or counseled . . . Hardie on ways to improve." *Id.* ¶ 88; *see id.* ¶¶ 64, 79–80.

Hardie filed a charge of race-based discrimination and retaliation with the United States Equal Employment Opportunity Commission on April 22, 2025. *Id.* ¶ 8.[1] He requested a Notice of Right to Sue on October 22, 2025, but did not receive a response. *Id.* ¶ 9.

On November 13, 2025, Hardie filed suit in this Court. His Complaint alleges racial discrimination (Count I), *id.* ¶¶ 93–112, failure to promote (Count II), *id.* ¶¶ 113–25, and

[1] Although Hardie's Complaint alleges that he filed his claim on April 22, 2025, the copy of the charge attached to his Complaint reflects a date of March 26, 2025, *see* Compl., Ex. A, at 1, Dkt. 1-1. Google assumes a filing date March 26, 2025, for the purposes of its motion. *See* Mem. in Supp. of Mot. to Dismiss 5 n.2, Dkt. 7. The Court will follow suit.

retaliation (Count III), *id.* ¶¶ 126–40, all in violation of Title VII, § 1981, and the D.C. Human Rights Act.

Google has moved to dismiss the Complaint in part pursuant to Federal Rule of Civil Procedure 12(b)(6). Mem. in Supp. of Mot. to Dismiss 1. In particular, Google challenges a subset of Hardie's claims as untimely, *see id.* at 5–7, and argues that Hardie's allegations regarding denial of adequate resources, account assignments, and support staff fail to state a claim for relief under Title VII, § 1981, or the D.C. Human Rights Act, *see id.* at 8–11.

## II. LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While this standard does not amount to a specific probability requirement, it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (citation modified).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the Court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471,

476 (D.C. Cir. 2012) (per curiam) (citation modified). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (citation modified). And an "unadorned, the-defendant-unlawfully-harmed-me accusation" is not credited. *Id.* Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. ANALYSIS

### A. Timeliness

Title VII, § 1981, and the D.C. Human Rights Act each set time limitations for employees to file claims. "Before suing under . . . Title VII, an aggrieved party must exhaust his administrative remedies by filing a charge of discrimination with the [Equal Employment Opportunity Commission] within 180 days of the alleged discriminatory incident." *Oviedo v. WMATA*, 948 F.3d 386, 393 (D.C. Cir. 2020); *see* 42 U.S.C. § 2000e-5(e)(1). This deadline extends to 300 days if the party "initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto." 42 U.S.C. § 2000e-5(e)(1). Section 1981, for its part, is subject to a four-year statute of limitations. *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 371, 383–84 (2004); *Uzoukwu v. Metro. Wash. Council of Gov'ts*, 27 F. Supp. 3d 62, 65–66 (D.D.C. 2014). And, at the time of the alleged events, the D.C. Human Rights Act required claims to be filed "within one year of the unlawful discriminatory act, or the discovery thereof." D.C. Code § 2-1403.16(a) (2015).[2]

[2] The statute was amended in March 2025 to extend the statute of limitations to two years. Google relies on the one-year statute of limitations, *see* Mem. in Supp. of Mot. to Dismiss 5, and Hardie

Based on these limitation periods, Google argues that the following claims are untimely:

- Title VII claims (of both race discrimination and retaliation) based on acts arising before May 30, 2024;
- § 1981 claims based on actions that occurred during Hardie's employment and took place before November 14, 2021; and
- D.C. Human Rights Act claims (of both race discrimination and retaliation) based on acts before March 26, 2024.

*See* Mem. in Supp. of Mot. to Dismiss 5–7.

Hardie does not dispute that acts falling within the timeframes Google identifies may not serve as the basis for liability for his claims. *See* Opp'n to Mot. to Dismiss 6–8, Dkt. 10. Rather, he asserts that such actions "may be used 'as background evidence in support of a timely claim,'" *id.* at 6 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)), and argues that the Court should not "excise this factual content" from the Complaint at the pleading stage, *id.* at 7.

Because the parties agree that acts predating May 30, 2024; November 14, 2021; and March 26, 2024, cannot serve as independent bases of liability under Title VII, § 1981, and the D.C. Human Rights Act, respectively, the Court will grant Google's motion as to any claims based on discrete acts that occurred during those time periods. Hardie may nevertheless plead allegations regarding those acts as background information in his Complaint. *See* Reply in Supp. of Mot. to Dismiss 3–4, Dkt. 11 ("To the extent Plaintiff is merely raising these discrete acts as so-called background evidence, he is free to do so, but well-settled case law prohibits him from pursuing those claims separately as an independent legal theory, nor is he able to recover for those untimely discrete acts.").

---

does not argue that the revised statute applies. Accordingly, the Court will apply the one-year statute of limitations in place at the time of the alleged conduct. *See Hodge v. Saba*, No. 24-cv-2247, 2025 WL 2959745, at *4 (D.D.C. Oct. 17, 2025).

### B. Denial of Adequate Resources, Staffing, and Account Assignments

Google further argues that Hardie's allegations of denial of adequate resources, staffing, and account assignments fail to state a claim under Title VII, § 1981, or the D.C. Human Rights Act. *See* Mem. in Supp. of Mot. to Dismiss 8–11. The Court agrees.

Absent direct evidence of discrimination, courts typically evaluate discrimination claims under Title VII, § 1981, and the D.C. Human Rights Act pursuant to the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014). *But see District of Columbia v. Bryant*, 307 A.3d 443, 456 (D.C. 2024) (declining to "follow the Supreme Court's approach to Title VII retaliation claims when determining what standard to apply to [D.C. Human Rights Act] retaliation claims"), *reh'g denied* (Sept. 27, 2024). Under that framework, the plaintiff has the burden of first establishing a prima facie case of discrimination by showing that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (per curiam) (citation modified). If "the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action in question." *Id.* (citation modified). "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (citation modified); *see McDonnell Douglas Corp.*, 411 U.S. at 804–05.

At the motion to dismiss stage, a plaintiff need not plead facts supporting every element of a prima facie case or anticipate the nondiscriminatory reasons that his employer may proffer. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–14 (2002). But, taken collectively, "the

inferences of discrimination drawn by the plaintiff" must be "reasonable and plausibly supported." *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017); *see Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025) ("[A] plaintiff must plead facts sufficient to allow a plausible inference that the challenged action was taken because of his race.").

As relevant here, a plaintiff "can raise an inference of discrimination by showing that [he] was treated differently from similarly situated employees who are not part of the protected class." *Brown*, 774 F.3d at 1022 (citation modified). To survive a motion to dismiss on a comparator theory, a plaintiff must allege facts showing that "a comparator was similarly positioned to [him] in at least some relevant respects," such that the comparator "provide[s] a benchmark" against which the court may "plausibly infer that discrimination caused the defendant's differential treatment of the plaintiff." *Joyner*, 140 F.4th at 531. While "[t]he traits a [plaintiff] must plead about comparators to provide a benchmark against which the court can make such a determination will vary widely from case to case," *id.*, the plaintiff must at least plead sufficient facts for the court to "infer more than the mere possibility of misconduct," *id.* at 532 (citation modified).

Here, Hardie's allegations as to proposed comparators do not give rise to a plausible inference of discrimination. Although he alleges that his "White counterpart," Harrison, had greater revenue streams in 2023, Compl. ¶ 60, he does not allege any facts from which the Court can infer that he and Harrison were similarly situated in terms of position, experience, or treatment, *see Joyner*, 140 F.4th at 531–32; *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties."); *Moreno-Livini v. AFL-CIO Hous. Inv. Tr.*, No. 24-cv-1392, 2024 WL 4144112, at *4 (D.D.C. Sept. 11, 2024) ("To plead discrimination via comparator evidence, Plaintiff must plausibly isolate her protected

characteristics as the only relevant difference with her colleagues.”). And his generalized allegation that his “non-Black counterparts” received better resources and staffing, Compl. ¶ 69, is “fatally nonspecific,” *Doe #1 v. Am. Fed’n of Gov’t Emps.*, 554 F. Supp. 3d 75, 103 (D.D.C. 2021); *see id.* (“[A] plaintiff’s assertion that . . . [he] is similarly situated to others is just a legal conclusion[,] and a legal conclusion is never enough to state a claim.” (citation modified)). Taken together, these allegations fall short of establishing a “benchmark” against which the Court may “plausibly infer . . . discrimination.” *Joyner*, 140 F.4th at 531; *see id.* at 530 n.2 (rejecting the notion that “a plaintiff need allege no more than ‘I was turned down for a job because of my race’ to state a claim of racial discrimination” and explaining that a plaintiff must offer “more than a bare assertion of discrimination”).

Accordingly, the Court will dismiss Hardie’s claims based on denial of resources, staffing, and account assignments.

* * *

For the foregoing reasons, it is

**ORDERED** that Google’s Partial Motion to Dismiss, Dkt. 7, is **GRANTED**. It is further

**ORDERED** that any Title VII, § 1981, or D.C. Human Rights Act claim predicated on acts predating May 30, 2024; November 14, 2021; or March 26, 2024, respectively, is **DISMISSED WITHOUT PREJUDICE**. It is further

**ORDERED** that any Title VII, § 1981, or D.C. Human Rights Act claim based on denial of resources, staffing, or account assignments is **DISMISSED WITHOUT PREJUDICE**. Finally, it is

**ORDERED** that the parties shall file, on or before October 19, 2026, a joint status report proposing a schedule for further proceedings.

**SO ORDERED.**

DABNEY L. FRIEDRICH
United States District Judge

September 21, 2026